UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CVS PHARMACY, INC.<br><br>Plaintiff,<br><br>vs.<br><br>BENEFICIAL HOLDINGS, INC.<br>BENEFICIAL HEALTH SYSTEMS, INC.<br>BENEFICIAL NUTRACEUTICALS, INC.<br>INTEGRATED BIOPHARMA, INC.<br>And CONTEMPORARY MARKETING, INC.,<br>Defendants. | **CROSS CLAIM AGAINST CO-DEFENDANT CMI**<br><br>Case No: CA 05 171 T |
| BENEFICAL HOLDINGS, INC. dba<br>BENEFICIAL HEALTH SYSTEMS,<br><br>Cross-Claimant<br><br>vs.<br><br>CONTEMPORARY MARKETING, INC.<br><br>Cross-Claim Defendant. | |

**CROSS CLAIM OF BENEFICIAL HOLDINGS, INC. DBA BENEFICIAL HEALTH SYSTEMS AGAINST CONTEMPORARY MARKETING, INC.**

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Beneficial Holdings, Inc., dba Beneficial Health Systems (hereinafter "Beneficial"), by and through counsel of record, hereby cross-claims against Co-Defendant Contemporary Marketing, Inc. (hereinafter "CMI") and for causes of action alleges as follows:

## FACTUAL BACKGROUND

1. Beneficial Holdings, Inc. dba Beneficial Health Systems (hereinafter "Beneficial") is a Nevada corporation and, at all times relevant hereto, was headquartered and maintained offices in Salt Lake City, State of Utah and was actively engaged in the transaction of business in Salt Lake City, State of Utah.

2. Subject matter jurisdiction is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332, and the matter in controversy, exclusive of interest and costs, exceeds $75,000.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

4. Co-Defendant CMI, through its agent and/or employee Ed Ellis, negotiated the placement of Beneficial's product, WillpowerRX™, for retail sale with CVS Pharmacy, Inc.

5. At all times relevant hereto, Mr. Ellis was acting within the scope and course of his employment with CMI and with the authority and approval of CMI.

6. Pursuant to those negotiations, Mr. Ellis suggested a number of possible options to Beneficial for the payment terms that would govern the sale of Beneficial's product to CVS, including "pay on scan" and "2% 30, net 31."

7. During these negotiations, Beneficial indicated to Mr. Ellis that it desired payment terms of 2% 30, Net 31 (hereinafter "Net 31").

8. Mr. Ellis indicated that he would use his best efforts to obtain the desired payment terms of Net 31 on behalf of Beneficial.

9. Thereafter, CMI drafted a letter to CVS and instructed Beneficial to sign the letter and return it to CMI.

10. The letter was a proposal to CVS that included payment terms of "pay on scan."

11. When Beneficial questioned CMI about the payment terms set forth in the letter, CMI explained that the letter was merely a starting point and as Beneficial's broker, CMI was going to use the letter as a tool in the negotiation process with CVS to achieve the more favorable payment terms of Net 31.

12. With this explanation, Beneficial agreed to execute the letter drafted by CMI and return it to CMI in compliance with CMI's request that it do so.

13. The letter was dated June 10, 2004.

14. Beneficial did not receive a response from CVS regarding the letter or any of the terms proposed therein.

15. Thereafter, however, Beneficial received CVS's first purchase orders. The purchase orders reflected payment terms of 2% 30 Net 31.

16. In addition to receiving the CVS purchase orders with payment terms of Net 31, Beneficial also received confirmation from Mr. Ellis regarding his negotiation of Net 31 payment terms with CVS. Specifically, Mr. Ellis traveled to Salt Lake City to meet with Beneficial regarding the CVS retail account.

17. In addition to Beneficial's President, the meeting was attended by a representative of Beneficial's manufacturer and one of Beneficial's private investors,

both of whom attended the meeting for the express purpose of discussing the payment terms that would govern the relationship between Beneficial and CVS.

18. At the meeting in Salt Lake City, Mr. Ellis represented that he had been able to obtain payment terms of Net 31 on behalf of Beneficial from CVS.

19. Mr. Ellis made this representation to all in attendance at the meeting held in Salt Lake City, including Beneficial's President, as well as a representative of Beneficial's manufacturer and one of Beneficial's private investors.

20. Mr. Ellis even boasted about his ability to obtain the Net 31 payment terms, attributing his success in this regard to the fact that he had "a friend" at CVS.

21. Mr. Ellis's representations were confirmed by the purchase orders received by Beneficial from CVS, which orders also reflected the very terms of 2%30 Net 31 as specified by Mr. Ellis.

22. Mr. Ellis's representations regarding the payment terms he negotiated with CVS are further confirmed by the "CVS Vendor Information Form" created by CMI on behalf of Beneficial and maintained by CMI, which form verifies that the payment terms governing the relationship between Beneficial and CVS are Net 31. A true and accurate copy of CMI's "CVS Vendor Information Form" prepared by CMI regarding Beneficial's account, is attached hereto as Exhibit A and incorporated herein by this reference.

23. Based upon Mr. Ellis's representations, as well as the specific payment terms identified in the CVS purchase orders, Beneficial received a factor loan from its manufacturer.

24. Additionally, also based upon Mr. Ellis's representations, as confirmed by the payment terms identified in the CVS purchase orders, Beneficial received funding from private investors.

25. As a direct result of the Net 31 payment terms, Beneficial obligated itself to repay the loans it received from its manufacturer and investors upon receipt of its first Net 31 day payment from CVS which was due on or about the first week of September, 2004.

26. Beneficial relied upon Mr. Ellis's representations, as well as the payment terms contained in the CVS purchase orders, when it obtained the subject loans from its manufacturer and private investors.

27. Beneficial's manufacturer similarly relied upon the representations made by Mr. Ellis, as well as the payment terms contained in the CVS purchase orders, when it agreed to advance funds to Beneficial and to manufacture product for Beneficial on terms.

28. Beneficial's private investor also relied upon the representations made by Mr. Ellis, as well as the payment terms contained in the CVS purchase orders, when he agreed to advance funds to Beneficial.

29. The loans referenced herein, were made on condition that they be repaid immediately following Beneficial's receipt of its first net 31 day payment from CVS.

30. If payment terms of Net 31 had not been obtained, Beneficial could not have accepted the CVS purchase orders because Beneficial could not have manufactured

enough product to fill the orders without the loans obtained as previously referenced herein.

31. Following the receipt of CVS's initial purchase orders, and prior to the time scheduled for CVS's first Net 31 day payment to Beneficial, CVS submitted numerous additional purchase orders to Beneficial.

32. Each of the additional purchase orders submitted by CVS also contained the identical payment terms of Net 31.

33. In reliance on the payment terms set forth in the purchase orders, Beneficial continued to accept CVS's orders, and Beneficial's manufacturer continued to fill the orders.

34. When it came time for Beneficial to receive its first payment from CVS according to the payment terms of Net 31, no payment was forthcoming.

35. Beneficial contacted its broker, co-defendant CMI, and inquired as to when the payment would be forthcoming.

36. CMI indicated that the first payment would be received on or about October 23rd, 2004, secondary to the lapse in time required to deliver product from the district warehouses to the individual retail stores, as well as the time required to enter and process new accounts within the vast CVS accounts payable system.

37. Relying once again upon the representations made by CMI, Beneficial continued to fill purchase orders it received from CVS, including refill orders from several CVS locations, subsequent to the date CVS was to make its first Net 31 day payment.

38. Some time later, while still awaiting receipt of the first payment, agents for Beneficial's manufacturer, as well as for Beneficial's private investor, contacted the accounts payable department of CVS directly and were told that it was the understanding of that department that CVS's payment obligations to Beneficial were "pay-on-scan."

39. When this information was reported to Beneficial, Beneficial assumed that CVS's accounting department was not aware of the terms contained in the CVS purchase orders and that the misunderstanding could be remedied.

40. To the contrary, when Beneficial contacted CMI for assistance in obtaining proper payment from CVS, CMI indicated that the payment terms were not going to be Net 31 after all and would, in fact, be subject to a "pay on scan" arrangement.

41. Following this information, Beneficial, as well as its manufacturer and private investor have all made demands of CVS to pay according to the terms agreed upon and contained in the purchase orders.

42. Each of these demands has been met with great resistance.

43. CMI's agent and/or employee, Mr. Ellis, has been dishonest about the representations he made to Beneficial, Beneficial's manufacturer and Beneficial's private investor during the Salt Lake City meeting referenced above.

44. Instead of supporting Beneficial and acting as Beneficial's agent to require CVS to honor the terms of its purchase orders, Co-Defendant CMI and Ed Ellis have betrayed Beneficial.

45. Similarly, CVS has refused to honor the payment terms set forth in its purchase orders or otherwise pay for the product it has ordered and received.

46. To date, Beneficial has filled approximately 92 purchase orders for CVS, totaling approximately $1,154,147.10 in receivables due and owing from CVS.

47. To date, CVS has made payments to Beneficial in the approximate amount of $ 82,280.12.

48. As a result of CMI's fraudulent and/or negligent misrepresentations and/or breach of its fiduciary duties to Beneficial, Beneficial has incurred debts and other obligations that it would not otherwise have incurred.

49. As an additional proximate result of the acts and/or omissions of CMI, Beneficial has been damaged in numerous respects, including, without limitation:

a. Beneficial's business relationships have been damaged as Beneficial has been unable to repay its manufacturer and other creditors;

b. Beneficial has been unable to advertise its product to the extent necessary to achieve market awareness and promote the sale of its product;

c. Beneficial has been unable to fill orders for its product;

d. Beneficial's reputation has been damaged;

e. Beneficial's prospective economic relations have been damaged;

f. Beneficial's contractual relations have been damaged;

g. Beneficial has lost sales and other retail accounts;

h. Beneficial has lost the celebrity sponsorship of its products;

i. Beneficial's stock has dropped from 35 cents per share to 4 cents per share; and

j. Beneficial has been rendered insolvent.

**FIRST CAUSE OF ACTION**
**(Fraud/ Misrepresentation)**

50. The information set forth in paragraphs 1-49 is realleged as if fully set forth herein.

51. Co-Defendant CMI, through its agent Ed Ellis, made material misrepresentations to Beneficial, a representative of Beneficial's manufacturer and one of Beneficial's private investors, including without limitation: (1) that he had negotiated payment terms for Beneficial of 2%30 net 31 with CVS; (2) that he was able to achieve the stated payment terms because of "a friend" that he had at CVS.

52. In furtherance of the material misrepresentations made by Defendant Ellis that the payment terms governing Beneficial's relationship with CVS were 2% 30 net 31, Defendant CMI created and maintained on file a document entitled "CVS Vendor Information Form" with Beneficial's payment terms contained therein, which document specifies payment terms of 2% 30 Net 31. (See Exhibit B).

53. Defendant Ellis made these material misrepresentations to Beneficial knowing them to be false and/or with malicious, willful and/or reckless disregard of the rights of Beneficial, knowing that he had insufficient knowledge upon which to base such representations.

54. Defendant Ellis made the representations to Beneficial, its manufacturer and its investor for the purpose of inducing Beneficial to accept and fill purchase orders for CVS.

55. Beneficial reasonably relied on the representation made by CMI through its agent Defendant Ellis and, in ignorance of the falsity of Mr. Ellis's representations, acted in reliance thereon in (1) obtaining loans from its manufacturer; (2) obtaining payment terms with its manufacturer; (3) obtaining loans from private investors; (4) entering into contracts to repay said loans within a time frame that corresponded with the date Beneficial was to receive its first Net 31 day payment from CVS and (5) expending large sums of capital in order to fill CVS's numerous purchase orders containing the very same 2% 30 Net 31 day payment terms.

56. In addition, Beneficial's manufacturer and private investor relied on the representations made by CMI through its agent Ed Ellis and acted in reliance thereon in (1) agreeing to factor a portion of Beneficial's receivable; (2) agreeing to loan Beneficial capital; (3) agreeing to manufacture product for Beneficial on terms; and (4) agreeing to fill CVS's purchase orders.

57. Beneficial's reliance on the material misrepresentations made by Co-Defendant CMI and Ed Ellis, and inducement to act thereon, has been to Beneficial's significant and substantial detriment and damage, including causing Beneficial to incur debts and obligations that it would not otherwise have incurred; causing Beneficial to lose celebrity spokespersons; subjecting Beneficial to lawsuits for failure to pay said debts and obligations; jeopardizing Beneficial's contractual relationship with its manufacturer; jeopardizing Beneficial's prospective economic advantages; rendering Beneficial insolvent; causing Beneficial to lose sales and retail contracts; causing Beneficial to sustain significant economic damage as a result of being unable to advertise

and market its products; causing Beneficial's stock value to decline from 35 cents per share to 4 cents per share and causing Beneficial's business to fail.

58. Co-Defendant CMI and Ed Ellis knew or acted with reckless disregard as to the truth or falsity of the material misrepresentations made by Mr. Ellis and understood that they would be relied upon by Beneficial and others and that said reliance would result in harm and damage to Beneficial.

59. Accordingly, Beneficial is entitled to an award of punitive damages against CMI in and amount calculated to punish and deter.

WHEREFORE, Beneficial prays for judgment against CMI under its First Cause of Action as set forth below.

**SECOND CAUSE OF ACTION**
**(Breach of Fiduciary Duty)**

60. The information set forth in paragraphs 1- 59 is realleged as if fully set forth herein.

61. CMI entered into an agency relationship with Beneficial and agreed to act as Beneficial's agent in negotiating retail contracts and distributing Beneficial's product.

62. CMI owed Beneficial a fiduciary duty of loyalty and honesty and to act in the best interests of Beneficial.

63. CMI breached the fiduciary duties owed to Beneficial in numerous respects, including without limitation, making material misrepresentations of fact to Beneficial, its manufacturer and its investor that CMI had negotiated payment terms of Net 31 with CVS on Beneficial's behalf; failing to stand by Beneficial and support Beneficial in its demand that CVS honor the Net 31 day payment terms as contained in CVS's purchase

orders; being dishonest with respect to the representations that were made by Ed Ellis to Beneficial, its manufacture and its investor during the aforementioned meeting in Salt Lake City, Utah; allowing Beneficial to enter into contracts and agreements and incur debts and obligations that it would not otherwise have entered into and/or incurred in the absence of the Net 31 day payment terms.

64. As a result of CMI's breach of its fiduciary duties, Beneficial has been damaged in numerous respects and is entitled to be compensated for the same.

WHEREFORE, Beneficial prays for judgment against CMI under its Second Cause of Action as set forth below.

**THIRD CAUSE OF ACTION**
**(Negligent Misrepresentation)**

65. The information set forth in paragraphs 1-64 is realleged as if fully set forth herein.

66. Defendant CMI, through its agent Ed Ellis, negligently made material misrepresentations to Beneficial, a representative of Beneficial's manufacturer and one of Beneficial's private investors, including without limitation: (1) that he had negotiated payment terms for Beneficial of Net 31 with CVS; (2) that he was able to achieve the stated payment terms because of "a friend" that he had at CVS.

67. In furtherance of the material misrepresentations negligently made by Defendant Ellis, Defendant CMI created and maintained on file a document entitled "CVS Vendor Information Form" with Beneficial's payment terms contained therein, which document specifies payment terms of Net 31.

68. Beneficial reasonably relied on the negligent misrepresentation made by CMI through its agent Ed Ellis and acted in reliance thereon in (1) obtaining loans from its manufacturer; (2) obtaining payment terms with its manufacturer; (3) obtaining loans from private investors; (4) entering into contracts to repay said loans within a time frame that corresponded with the date Beneficial was to receive its first Net 31 day payment from CVS and (5) expending large sums of capital in order to fill CVS's numerous purchase orders containing the very same Net 31 day payment terms.

69. In addition, Beneficial's manufacturer and private investor reasonably relied on the negligent representations made by CMI through its agent Ed Ellis as well and acted in reliance thereon in (1) agreeing to factor a portion of Beneficial's receivable; (2) agreeing to loan Beneficial capital; (3) agreeing to manufacture product for Beneficial on terms; and (4) agreeing to fill CVS's purchase orders.

70. Beneficial's reliance on the negligent misrepresentations made by CMI has been to Beneficial's significant and substantial detriment and damage, including causing Beneficial to incur debts and obligations that it would not otherwise have incurred; causing Beneficial to lose celebrity spokespersons; subjecting Beneficial to lawsuits for failure to pay said debts and obligations; jeopardizing Beneficial's contractual relationship with its manufacturer; jeopardizing Beneficial's prospective economic advantages; rendering Beneficial insolvent; causing Beneficial to lose sales and retail accounts; causing Beneficial to sustain significant economic damage as a result of being unable to advertise and market its products; causing Beneficial's stock value to decline from 35 cents per share to 4 cents per share; and causing Beneficial's business to fail.

WHEREFORE, Beneficial prays for judgment against CMI under its Third Cause of Action as set forth below.

**FOURTH CAUSE OF ACTION**
**(Intentional Interference with Contractual Relations)**

71. The information set forth in paragraphs 1-70 is realleged as if fully set forth herein.

72. CMI intentionally interfered with Beneficial's contractual relations with its manufacturer, as well as with other retail vendors and private investors, when CMI represented to Beneficial and others that the retail relationship with CVS was subject to payment terms of Net 31 and allowed Beneficial to act in reliance on that representation, in entering into loan agreements, filling CSV's purchase orders and incurring debts and obligations that it would not otherwise have entered into and incurred in the absence of the subject payment terms.

73. CMI's interference was for an improper purpose and/or by an improper means.

74. CMI's interference resulted in significant and substantial injury to Beneficial, including without limitation, causing Beneficial to incur debts and obligations that it would not otherwise have incurred; causing Beneficial to lose celebrity spokespersons; subjecting Beneficial to lawsuits for failure to pay said debts and obligations; jeopardizing Beneficial's contractual relationship with its manufacturer; jeopardizing Beneficial's prospective economic advantages; rendering Beneficial insolvent; causing Beneficial to lose sales and retail accounts; causing Beneficial to sustain significant economic damage as a result of being unable to advertise and market its products;

causing Beneficial's stock value to decline from 35 cents per share to 4 cents per share; and causing Beneficial's business to fail.

WHEREFORE, Beneficial prays for judgment against CMI under its Fourth Cause of Action as follows:

**FIFTH CAUSE OF ACTION**
**(Intentional Interference with Prospective Economic Advantage)**

75. The information contained in paragraphs 1-74 is realleged as if fully set forth herein.

76. CMI intentionally interfered with Beneficial's prospective economic advantage when CMI represented to Beneficial and others that the retail relationship with CVS was subject to payment terms of Net 31 and allowed Beneficial to act in reliance on that representation, in entering into loan agreements, filling CSV's purchase orders and incurring debts and obligations that it would not otherwise have entered into and incurred in the absence of the subject payment terms.

77. CMI's interference was for an improper purpose and/or by an improper means.

78. CMI's interference resulted in significant and substantial injury to Beneficial, including without limitation, causing Beneficial to incur debts and obligations that it would not otherwise have incurred; causing Beneficial to lose celebrity spokespersons; subjecting Beneficial to lawsuits for failure to pay said debts and obligations; jeopardizing Beneficial's contractual relationship with its manufacturer; jeopardizing Beneficial's prospective economic advantages; rendering Beneficial insolvent; causing Beneficial to lose sales and retail accounts; causing Beneficial to sustain significant

economic damage as a result of being unable to advertise and market its products; causing Beneficial's stock value to decline from 35 cents per share to 4 cents per share; and causing Beneficial's business to fail.

WHEREFORE, Beneficial prays for judgment against CMI under its Fifth Cause of Action as set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Beneficial seeks relief as follows:

1. For an award of actual and consequential damages, including but not limited to lost profits, punitive damages in an amount calculated to punish and deter CMI, pre and post-judgment interest at the maximum rate allowed by law, and costs and attorneys' fees;

2. For such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Beneficial, by and through counsel, hereby requests a trial by jury in the above-captioned matter.

DATED this 16th day of November, 2005.

Respectfully submitted,

David A. Wollin, #4950
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel: 401-274-7200
Fax: 401-351-4607

Jacquelynn D. Carmichael
EISENBERG, GILCHRIST & MORTON
900 Parkside Tower
215 South State Street
Salt Lake City, Utah 84111
Telephone: (801) 366-9100

*Attorneys for Defendants/Crossclaimants*
*Beneficial Holdings, Inc. dba*
*Beneficial Health Systems, Inc*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of November, 2005, a copy of the foregoing was hand-delivered to:

Todd M. Reed, Esq.
Edwards & Angell LLP
2800 Financial Plaza
Providence, R.I. 02903

and a copy of the foregoing was mailed, U.S. first class postage, to the following:

Nicholas Fortuna Esq.
Jesse A. Kaplan, Esq.
Allyn & Fortuna LLP
200 Madison Avenue, 5th Floor
New York, New York 10016

John P. Mullen, Esq.
Anderson & Karrenberg
50 W. Broadway, Suite 700
Salt Lake City, Utah 84101

Kenneth J. Fisch, Esq.
4200 West Peterson Avenue, Suite 140
Chicago, Illinois 60646

[signature]

360287_1.doc