UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CVS PHARMACY, INC.

Plaintiff,

- against -

Civil Action No.: 05-171-T

BENEFICIAL HOLDINGS, INC., BENEFICIAL HEALTH SYSTEMS, INC., BENEFICIAL NUTRACEUTICALS, INC., INTEGRATED BIOPHARMA, INC., and CONTEMPORARY MARKETING , INC.

Defendants.

**AFFIDAVIT OF THOMAS SULLIVAN**

Thomas Sullivan, being duly sworn, states as follows:

1. I am employed as a Category Manager for CVS Pharmacy Inc. ("CVS"), the plaintiff in the above-captioned action.

2. I am fully familiar with the facts set forth herein, except where stated upon information and belief, and as to those matters, I believe them to be true.

3. Defendant CVS is a corporation organized and existing under the laws of the State of Rhode Island with its principal place of business located at 1 CVS Drive, Woonsocket, Rhode Island 02895.

4. Through a variety of subsidiary and affiliate entities, CVS operates retail drug stores and pharmacies under the trade name "CVS" or "CVS/pharmacy."

5. CMI is a sales representative and/or broker that introduces its client's products to various retailers, including CVS.

6. In or about April 2004, Ed Ellis, CMI's Vice President of marketing and sales, contacted me regarding whether CVS would be interested in carrying a weight loss product

called WillpowerRX. Ed Ellis indicated that CMI was the broker for WillpowerRX's distributors, Beneficial Holdings, Inc., Beneficial Health Systems, Inc., and Beneficial Nutraceuticals, Inc. (referred to collectively as "Beneficial").

7. After expressing interest in WillpowerRX, CVS entered into discussions with CMI, which acted as Beneficial's exclusive agent, regarding CVS' possible purchase of WillpowerRX. While many of these discussions entailed telephone conversations between me and Ed Ellis, I also met with Ed Ellis at CVS' Woonsocket, Rhode Island headquarters on approximately three to four occasions during the spring of 2004. Harvey Carmichael, Beneficial's president, was also present at one of the meetings.

8. During the telephone conversations and meetings, including the meeting that Harvey Carmichael attended, we discussed the terms and conditions that CVS would require if CVS was going to purchase WillpowerRX. This included pricing, payment terms, displays, returns, slotting, insurance, indemnification, and advertising/marketing requirements. The parties also discussed the quantity of WillpowerRX that Beneficial would need to guaranty in order to adequately stock CVS' retail locations.

9. Of particular importance was the issue of payment terms. I told Ed Ellis and Harvey Carmichael that CVS viewed WillpowerRX as a risky endeavor because Beneficial was a new vendor and because WillpowerRX was a relatively new product with no proven sales record, and no recognizable brand name.

10. Therefore, I told CMI and Beneficial on multiple occasions, including the meetings at CVS' headquarters, that consistent with CVS' policy towards new products and vendors, CVS would only consider purchasing WillpowerRX if Beneficial was willing to offer CVS "Pay on Scan" payment terms. I made it quite clear that CVS would not negotiate this

point. Ed Ellis and Harvey Carmichael expressed their understanding and agreed that the payment terms would have to be "Pay on Scan."

11. "Pay on Scan" is similar to a consignment arrangement whereby a vendor is paid based on its product's sales performance. Under a "Pay on Scan" arrangement, CVS would only be responsible for paying for units of WillpowerRX that CVS actually sold to its customers at its retail locations.

12. Through "Pay on Scan" payment terms, Beneficial would be given the opportunity of introducing its product into the national marketplace and be able to take advantage of CVS' brand name and popularity.

13. Moreover, even with "Pay on Scan" payment terms, CVS runs the risk of filling valuable shelf space with a product that could perform poorly. Thus, CVS could still lose out on revenue it would have earned had it filled its shelves with a product with a proven sales record.

14. On June 10, 2004, Harvey Carmichael forwarded a letter to CVS (the "Carmichael Letter") outlining the details of the agreement negotiated with CVS, which included some of the terms and conditions that I had previously discussed with Ed Ellis and Harvey Carmichael. A true accurate copy of the Carmichael Letter is attached as **Exhibit A** of this affidavit.

15. The Carmichael Letter detailed the proposed price, payment terms, displays, returns, and slotting for WillpowerRx. The Carmichael Letter stated that the price for WillpowerRX would be $23.97 per unit. The Carmichael Letter also stated that Beneficial would "offer CVS an ongoing BDF marketing fund of 10% to be taken off invoice." The Carmichael Letter further stated that all returns would be handled as outlined in the CVS return goods agreement. The Carmichael Letter also authorized CVS to deduct a one time charge of

$5,000 to cover new item slotting. Beneficial also agreed to undertake certain marketing and advertising efforts.

16. The Carmichael Letter also stated that **"Beneficial will extend terms of Pay on Scan for a period of one year,** after which the terms will switch to 2%30 net 31 days (Emphasis added). Accordingly, pursuant to the terms of the Carmichael Letter, CVS would only have to pay for WillpowerRX that CVS sold during the first year of the relationship. After one year, the payment terms would become "2%30 net 31 days."

17. Subsequent to CVS' receipt of the Carmichael Letter, neither CMI nor Beneficial ever indicated to me that Beneficial was revoking its agreement to offer "Pay on Scan" payment terms. In fact, CMI and Beneficial continued to aggressively push for CVS to issue purchase orders.

18. On July 2, 2004, Ed Ellis, Beneficial's agent, sent me an email regarding Beneficial's marketing and promotional campaign. Ed Ellis' email reiterated that the payment terms for the purchase of WillpowerRX would be "Pay on Scan." The email stated in pertinent part, "They are pay on scan." A true and accurate copy of Ed Ellis' July 2, 2004 email is attached as **Exhibit B** of this affidavit.

19. In early July 2004, I informed Ed Ellis, Beneficial's agent, that CVS was going to accept the terms negotiated and outlined in the Carmichael Letter, and that purchase orders would be forthcoming.

20. Accordingly, CVS transmitted purchase orders to CMI in Buffalo Grove, Illinois. CVS' initial purchase orders for WillpowerRX were transmitted to CMI on July 8, 2004.

21. Beneficial claims that it accepted CVS purchase orders by executing a written purchase order confirmation on a form prepared by CMI (*See* Declaration of Harvey Carmichael

dated May 18, 2006, ¶ 8, Ex. D). Neither Beneficial nor CMI ever provided CVS with these purchase order confirmation forms.

22. Since the CVS computer system that generates purchase orders does not have the capability of actually writing "Pay on Scan" on the purchase orders, CVS generally indicates "Pay on Scan" payment terms by leaving the purchase order's payment terms blank. Leaving the payment terms blank is a commercially acceptable standard for indicating "Pay on Scan" payment terms.

23. Due to a clerical error, however, a number of the relevant CVS purchase orders inadvertently and mistakenly included the eventual payment terms of "2%30 net 31," rather than the "Pay on Scan" payment terms that Beneficial had previously agreed to. Despite the language found on the relevant CVS purchase orders, CVS never agreed to payment terms other than "Pay on Scan."

24. In early June, 2004, my office instructed CVS' accounting department to set Beneficial up as a "Pay on Scan" vendor. Based on these instructions, on June 7, 2004, Lorraine Cournoyer sent an email to Rita Keneally in CVS' accounting department which I was carbon copied on, advising the accounting department to code Beneficial as a "Pay on Scan" vendor. A true and accurate copy of Lorraine Cournoyer's June 7, 2004 email is attached as **Exhibit C** of this affidavit.

25. While CVS' accounting department coded Beneficial as a "Pay on Scan" vendor, this information was not properly inputted into the system that generates purchase orders. Rather, when CVS initially set up Beneficial's vendor account, CVS inadvertently coded Beneficial as a "2%30 net 31" vendor in the system that automatically generates purchase orders, despite my request that Beneficial be coded as a "Pay on Scan" vendor.

26. As CVS' computer system automatically generates purchase orders without oversight from my office, I did not review the relevant purchase orders before they were issued to CMI. Accordingly, I did not realize that the purchase orders contained clerical errors until well after they were issued to CMI.

27. In early September 2004, Ed Ellis contacted my assistant, Tobey Lombardi, regarding the purchase orders' apparent clerical error as to payment terms. Ed Ellis, acting as Beneficial's agent, confirmed that Beneficial was aware that CVS' purchase orders incorrectly contained "2%30 net 31" payment terms and that the correct payment terms were "Pay on Scan."

28. Once CVS detected the purchase order's clerical error, CVS changed the payment terms in its computer system so that all purchase orders that it issued to CMI contained "Pay on Scan" payment terms. Beneficial subsequently filled the purchase orders with "Pay on Scan" payment terms.

29. Furthermore, CVS always paid Beneficial on a "Pay on Scan" basis. Likewise, Beneficial always accepted payment on a "Pay on Scan" basis. Until CVS discontinued WillpowerRX, Beneficial never questioned or disputed CVS' payments.

30. In early 2005, CVS discontinued the sale of WillpowerRX due to extremely poor sales. Subsequently, Beneficial and its counsel contacted CVS and demanded payment from CVS for all units of WillpowerRX that CVS' had ordered, regardless of whether CVS sold these units at its retail locations. Even though CVS' had always paid Beneficial on a "Pay on Scan" basis, Beneficial was claiming that it would never agree to "Pay on Scan" payment terms and that the payment terms were always "2%30 net 31."

31. During the course of these discussions, Beneficial's own agent, Ed Ellis, reaffirmed that Beneficial agreed to "Pay on Scan" payment terms. On March 11, 2005, Ed Ellis

sent Harvey Carmichael and me several emails regarding Beneficial's recent demands for payment. True and accurate copies of Ed Ellis' March 11, 2005 emails to Harvey Carmichael are attached as **Exhibit D** of this affidavit.

32. Beneficial and plaintiff Integrated Biopharma, Inc. ("Integrated"), have referred to the purchase orders' purported "Terms and Conditions." The relevant purchase orders issued by CVS, however, did not contain the "Terms and Conditions" that Beneficial and Integrated have referenced. Rather, these "Terms and Conditions" were merely available on www.cvssuppliers.com, a web site maintained by CVS that contains supplier/vendor information.

33. CVS' web site, www.cvssuppliers.com is for informational purposes only. CVS never referred Beneficial to www.cvssuppliers.com and informed Beneficial that the contents of that web site would be incorporated into CVS' agreement with Beneficial. Moreover, there is no indication that Beneficial ever accessed this web site and agreed to abide by the "Terms and Conditions" or requested that they be included in the agreement.

34. Rather, CVS directly negotiated the deal's terms and conditions with Beneficial and its agent, CMI. For example, on or about May 18, 2006, Beneficial entered into a Return Option Agreement with CVS dealing with the return of goods. Additionally, on or about June 21, 2006, Beneficial entered into an Indemnification Agreement with CVS. In addition to containing an indemnification provision, this Indemnification Agreement also contained insurance procurement requirements.

35. Moreover, Beneficial has abided by the terms and conditions outlined in the Carmichael Letter dealing with slotting requirements, the BDF marketing fund, and returned CVS' returned goods policy, despite the fact that these terms were not included in CVS'

purchase orders. Accordingly, neither CVS nor Beneficial utilized, referred to, or incorporated the "Terms and Conditions" on www.cvssuppliers.com.

36. Since this litigation has commenced, Beneficial has rejected all payments made by CVS.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 15TH DAY OF JUNE 2006.

Thomas Sullivan