UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

---

CVS PHARMACY, INC.

Plaintiff,

- against - Civil Action No.: 05-171-T

BENEFICIAL HOLDINGS, INC., BENEFICIAL HEALTH SYSTEMS, INC., BENEFICIAL NUTRACEUTICALS, INC., INTEGRATED BIOPHARMA, INC., and CONTEMPORARY MARKETING , INC.

Defendants.

---

**PLAINTIFF'S STATEMENT OF UNDISPUTED/DISPUTED MATERIAL FACTS IN OPPOSITION TO THE MOVING DEFENDANTS' MOTION FOR PARTIAL <u>SUMMARY JUDGMENT</u>**

Plaintiff, CVS Pharmacy, Inc. ("CVS"), respectfully submits this Statement of Undisputed/Disputed Material Facts in opposition to defendants Beneficial Holding, Inc., Beneficial Health Systems, Inc., Beneficial Nutraceutical, Inc. (referred to collectively as "Beneficial"), and Integrated Biopharma, Inc.s' ("Integrated"), motion for partial summary judgment:

1. Defendant CVS is a corporation organized and existing under the laws of the State of Rhode Island with its principal place of business located at 1 CVS Drive, Woonsocket, Rhode Island 02895 (*See* Affidavit of Thomas Sullivan dated June 15, 2006 ("Sullivan Aff."),¶ 3). Through a variety of subsidiary and affiliate entities, CVS operates retail drug stores and pharmacies under the trade name "CVS" or "CVS/pharmacy" (*See* Sullivan Aff., ¶ 4).

2. CMI is a sales representative and/or broker that introduces its client's products to various retailers, including CVS (*See* Sullivan Aff., ¶ 5; Affidavit of Edwin Ellis dated June 16,

2006 ("Ellis Aff."), ¶ 2). In or about April 2004, Ed Ellis, CMI's Vice President of marketing and sales, contacted Tom Sullivan, one of CVS' Category Managers, regarding whether CVS would be interested in carrying a weight loss product called WillpowerRX (*See* Sullivan Aff., ¶ 6; Ellis Aff., ¶ 3). Ed Ellis indicated that CMI was the broker for WillpowerRX's distributors, Beneficial Holdings, Inc., Beneficial Health Systems, Inc., and Beneficial Nutraceuticals, Inc. (referred to collectively as "Beneficial") (*See* Sullivan Aff., ¶ 6).

3. After expressing interest in WillpowerRX, CVS entered into discussions with CMI, which acted as Beneficial's exclusive agent, regarding CVS' possible purchase of WillpowerRX (*See* Sullivan Aff., ¶ 7; Ellis Aff., ¶ 3). While many of these discussions entailed telephone conversations between Tom Sullivan and Ed Ellis, Tom Sullivan also met with Ed Ellis at CVS' Woonsocket, Rhode Island headquarters on approximately three to four occasions during the spring of 2004 (*See* Sullivan Aff., ¶ 7). Harvey Carmichael, Beneficial's president, was also present at one of the meetings (*See* Sullivan Aff., ¶ 7).

4. During the telephone conversations and meetings, including the meeting that Harvey Carmichael attended, CVS, CMI, and Beneficial discussed the terms and conditions that CVS would require if CVS was going to purchase WillpowerRX (*See* Sullivan Aff., ¶ 8; Ellis Aff., ¶ 3). This included pricing, payment terms, displays, returns, slotting, insurance, indemnification, and advertising/marketing requirements (*See* Sullivan Aff., ¶ 8). The parties also discussed the quantity of WillpowerRX that Beneficial would need to guaranty in order to adequately stock CVS' retail locations (*See* Sullivan Aff., ¶ 8).

5. Of particular importance was the issue of payment terms. Tom Sullivan told Ed Ellis and Harvey Carmichael that CVS viewed WillpowerRX as a risky endeavor because

Beneficial was a new vendor and because WillpowerRX was a relatively new product with no proven sales record, and no recognizable brand name (*See* Sullivan Aff., ¶ 9).

6. Therefore, Tom Sullivan told CMI and Beneficial on multiple occasions, including the meetings at CVS' headquarters, that consistent with CVS' policy towards new products and vendors, CVS would only consider purchasing WillpowerRX if Beneficial was willing to offer CVS "Pay on Scan" payment terms (*See* Sullivan Aff., ¶ 10; Ellis Aff., ¶ 3). Tom Sullivan made it quite clear that CVS would not negotiate this point (*See* Sullivan Aff., ¶ 10). Ed Ellis and Harvey Carmichael expressed their understanding and agreed that the payment terms would have to be "Pay on Scan" (*See* Sullivan Aff., ¶ 10; Ellis Aff., ¶ 3).

7. "Pay on Scan" is similar to a consignment arrangement whereby a vendor is paid based on its product's sales performance (*See* Sullivan Aff., ¶ 11). Under a "Pay on Scan" arrangement, CVS would only be responsible for paying for units of WillpowerRX that CVS actually sold to its customers at its retail locations (*See* Sullivan Aff., ¶ 11).

8. Through "Pay on Scan" payment terms, Beneficial would be given the opportunity of introducing its product into the national marketplace and be able to take advantage of CVS' brand name and popularity (*See* Sullivan Aff., ¶ 12).

9. Moreover, even with "Pay on Scan" payment terms, CVS runs the risk of filling valuable shelf space with a product that could perform poorly. Thus, CVS could still lose out on revenue it would have earned had it filled its shelves with a product with a proven sales record (*See* Sullivan Aff., ¶ 13).

10. In May 2004, Ed Ellis attended a WillpowerRX planning meeting in Buffalo Grove, Illinois. At the planning meeting, Beneficial's president, Harvey Carmichael, and Darren Lopez, a consultant to Beneficial, discussed and acknowledged that Beneficial would agree to

"Pay on Scan" payment terms. At the meeting, Ed Ellis, Harvey Carmichael, and Darren Lopez reviewed accounts (i.e., CVS, GNC, Walgreens) and made plans for the initial roll out of WillpowerRX (*See* Ellis Aff., ¶ 4).

11. On June 10, 2004, Harvey Carmichael forwarded a letter to CVS (the "Carmichael Letter") outlining the details of the agreement negotiated with CVS, which included some of the terms and conditions that Tom Sullivan had previously discussed with Ed Ellis and Harvey Carmichael. (*See* Sullivan Aff., ¶ 14, Ex. A; Ellis Aff., ¶ 5).

12. The Carmichael Letter detailed the proposed price, payment terms, displays, returns, and slotting for WillpowerRx (*See* Sullivan Aff., ¶ 15, Ex. A). The Carmichael Letter stated that the price for WillpowerRX would be $23.97 per unit. The Carmichael Letter also stated that Beneficial would "offer CVS an ongoing BDF marketing fund of 10% to be taken off invoice." The Carmichael Letter further stated that all returns would be handled as outlined in the CVS return goods agreement. The Carmichael Letter also authorized CVS to deduct a one time charge of $5,000 to cover new item slotting. Beneficial also agreed to undertake certain marketing and advertising efforts (*See* Sullivan Aff., ¶ 15, Ex. A).

13. The Carmichael Letter stated that "**Beneficial will extend terms of Pay on Scan for a period of one year**, after which the terms will switch to 2%30 net 31 days (*See* Sullivan Aff., ¶ 16, Ex. A (Emphasis added); Ellis Aff., ¶ 5). Accordingly, pursuant to the terms of the Carmichael Letter, CVS would only have to pay for WillpowerRX that CVS sold during the first year of the relationship (*See* Sullivan Aff., ¶ 16, Ex. A). After one year, the payment terms would become "2%30 net 31 days" (*See* Sullivan Aff., ¶ 16, Ex. A).

14. Subsequent to CVS' receipt of the Carmichael Letter, neither CMI nor Beneficial ever indicated to CVS that Beneficial was revoking its agreement to offer "Pay on Scan"

payment terms (*See* Sullivan Aff., ¶ 17). In fact, CMI and Beneficial continued to aggressively push for CVS to issue purchase orders (*See* Sullivan Aff., ¶ 17).

15. On July 2, 2004, Ed Ellis, Beneficial's agent, sent Tom Sullivan an email regarding Beneficial's marketing and promotional campaign. Ed Ellis' email reiterated that the payment terms for the purchase of WillpowerRX would be "Pay on Scan." The email stated in pertinent part, "**They are pay on scan**" (*See* Sullivan Aff., ¶ 18, Ex. B).

16. In early July 2004, Tom Sullivan informed Ed Ellis that that CVS was going to accept the terms negotiated and outlined in the Carmichael Letter, and that purchase orders would be forthcoming (*See* Sullivan Aff., ¶ 19).

17. Accordingly, CVS transmitted purchase orders to CMI in Buffalo Grove, Illinois (*See* Sullivan Aff., ¶ 20). CVS' initial purchase orders for WillpowerRX were transmitted to CMI on July 8, 2004 (*See* Sullivan Aff., ¶ 20).

18. Beneficial claims that it accepted CVS purchase orders by executing a written purchase order confirmation on a form prepared by CMI (*See* Declaration of Harvey Carmichael dated May 18, 2006, ¶ 8, Ex. D). Neither Beneficial nor CMI ever provided CVS with these purchase order confirmation forms (*See* Sullivan Aff., ¶ 21).

19. Since the CVS computer system that generates purchase orders does not have the capability of actually writing "Pay on Scan" on the purchase orders, CVS generally indicates "Pay on Scan" payment terms by leaving a purchase order's payment terms blank (*See* Sullivan Aff., ¶ 22). Leaving the payment terms blank is a commercially acceptable standard for indicating "Pay on Scan" payment terms (*See* Sullivan Aff., ¶ 22).

20. Due to a clerical error, a number of the relevant CVS purchase orders inadvertently and mistakenly included the eventual payment terms of "2%30 net 31," rather than

the "Pay on Scan" payment terms that Beneficial had previously agreed to (*See* Sullivan Aff., ¶ 23). Despite the language found on the relevant CVS purchase orders, CVS never agreed to payment terms other than "Pay on Scan" (*See* Sullivan Aff., ¶ 23; Ellis Aff., ¶ 12).

21. In early June, 2004, Tom Sullivan's office instructed CVS' accounting department to set Beneficial up as a "Pay on Scan" vendor (*See* Sullivan Aff., ¶ 24). Based on these instructions, Lorraine Cournoyer sent Rita Keneally in CVS' accounting department an email on June 7, 2004, advising the accounting department to code Beneficial as a "Pay on Scan" vendor (*See* Sullivan Aff., ¶ 24, Ex. C). While CVS' accounting department coded Beneficial as a "Pay on Scan" vendor, this information was not properly inputted into the system that automatically generates purchase orders (*See* Sullivan Aff., ¶ 25). Rather, when CVS initially set up Beneficial's vendor account, CVS inadvertently coded Beneficial as a "2%30 net 31" vendor in the system that automatically generates purchase orders, despite Tom Sullivan's request that Beneficial be coded as a "Pay on Scan" vendor (*See* Sullivan Aff., ¶ 25).

22. As CVS' computer system automatically generates purchase orders without oversight from the category manager's office, Tom Sullivan did not review the relevant purchase orders before they were issued to CMI (*See* Sullivan Aff., ¶ 26). Accordingly, CVS did not realize that the purchase orders contained clerical errors until well after they were issued to CMI (*See* Sullivan Aff., ¶ 26).

23. CMI subsequently received the relevant CVS purchase orders containing the following language: "Disc. Pct.: 2 Disc. Days: 30 Net Days: 31." Ed Ellis spoke with Harvey Carmichael on July 8, 2004, regarding this language. Ed Ellis confirmed with Harvey Carmichael at that time that the payment terms were "pay on scan" despite this language.

Moreover, Ed Ellis did not perceive this language to be problematic since Beneficial had already agreed in writing to "Pay on Scan" payment terms. (*See* Ellis Aff., ¶ 6).

24. In August 2004, Ed Ellis attended a WillpowerRX planning meeting in Salt Lake City, Utah (*See* Ellis Aff., ¶ 7). During this planning meeting, Ed Ellis reviewed an Account Planner with Harvey Carmichael and other Beneficial executives (*See* Ellis Aff., ¶ 7). The Account Planner outlined a number of interested retailer's key terms and conditions and noted that CVS was "**pay on scan for 1 year**" (*See* Ellis Aff., ¶ 7, Ex. A (emphasis added)).

25. In September 2004, Ed Ellis spoke to Harvey Carmichael and reaffirmed that Beneficial and CVS only agreed to "Pay on Scan" payment terms, regardless of what the purchase orders stated (*See* Ellis Aff., ¶ 8).

26. In early September 2004, Ed Ellis contacted Tom Sullivan's assistant, Tobey Lombardi, regarding the purchase orders' apparent clerical error as to payment terms. Ed Ellis, acting as Beneficial's agent, confirmed that Beneficial was aware that CVS' purchase orders incorrectly contained "2%30 net 31" payment terms and that the correct payment terms were "Pay on Scan" (*See* Sullivan Aff., ¶ 27; Ellis Aff., ¶ 9). Ed Ellis also told Tobey Lombardi that despite the fact that Beneficial was aware of the mistakes and agreed that the CVS purchase orders were supposed to have been "Pay on Scan," Beneficial might try to take advantage of the situation by claiming otherwise (*See* Ellis Aff., ¶ 9).

27. Once CVS detected the purchase order's clerical error, CVS changed the payment terms in its computer system so that all purchase orders that it issued to CMI contained "Pay on Scan" payment terms (*See* Sullivan Aff., ¶ 26). Beneficial subsequently filled the purchase orders with "Pay on Scan" payment terms (*See* Sullivan Aff., ¶ 28).

28. Furthermore, CVS always paid Beneficial or Beneficial's designated payees on a "Pay on Scan" basis. Likewise, Beneficial and its payees always accepted payment on a "Pay on Scan" basis (*See* Sullivan Aff., ¶ 29). Until CVS discontinued WillpowerRX, Beneficial never questioned or disputed CVS' payments (*See* Sullivan Aff., ¶ 29).

29. On September 21, 2004, Ed Ellis sent Harvey Carmichael an email regarding WillpowerRX's sales performance. Ed Ellis estimated that Beneficial would receive its first scan payment the week of October 23, 2004. Likewise, on or about October21, 2004, Ed Ellis sent Harvey Carmichael an email regarding the latest WillpowerRX sales figures (*See* Ellis Aff., ¶ 10, Ex. B). According to Ed Ellis, the purpose of providing Beneficial with the WillpowerRX sales figures was so that Beneficial could estimate the amounts of upcoming scan payments (*See* Ellis Aff., ¶ 10, Ex. B).

30. Beneficial also agreed to "Pay on Scan" payment terms with other retailers such as General Nutrition Centers ("G.N.C.") (*See* Ellis Aff., ¶ 11).

31. In early 2005, CVS discontinued the sale of WillpowerRX due to extremely poor sales (*See* Sullivan Aff., ¶ 30). Subsequently, Beneficial and its counsel contacted CVS demanded payment from CVS for all units of WillpowerRX that CVS' had ordered, regardless of whether CVS sold these units at its retail locations (*See* Sullivan Aff., ¶ 30). Even though CVS' had always paid Beneficial on a "Pay on Scan" basis, Beneficial was claiming that it would never agree to "Pay on Scan" payment terms and that the payment terms were always "2%30 net 31" (*See* Sullivan Aff., ¶ 30).

32. During the course of these discussions, Beneficial's own agent, Ed Ellis, reaffirmed that Beneficial intended to agree to "Pay on Scan" payment terms (*See* Sullivan Aff., ¶ 31, Ex. D). On March 11, 2005, Ed Ellis sent Harvey Carmichael an email regarding

Beneficial's recent demands for payment. In doing so, Ed Ellis confirmed that the payment terms were "Pay on Scan" (*See* Sullivan Aff., ¶ 31, Ex. D). Ed Ellis stated in pertinent part as follows:

> "Harvey,
> I have left you at least a dozen messages and now your phone is full. I am very disappointed at the way things are turning out. What I wanted to review was the letter that was sent to CVS by your attorney. **As you know since the day that we set this account up, the terms were pay on scan. You have been paid according to those terms**…" (*See* Sullivan Aff., ¶ 31, Ex. D (Emphasis added)).

33. Additionally, on March 11, 2005, Ed Ellis sent an additional email to Beneficial's president Harvey Carmichael. It states in pertinent part as follows:

> "In response to your attached email, **you were fully aware that CVS was pay on scan. We discussed the terms in our May planning meeting in Salt Lake as well as several subsequent phone conversations** with Scott, Mike, and I. Conversations with Stewart, Adam and Darren also reviewed this. **In addition the offer letter that was approved by you clearly states that the terms offered are Pay on Scan for one year** with terms of 2% 30 net 45 there after. Additionally, we spoke in September just after you received the CVS about this specifically, when you questioned what the po's stated. **At this time I reaffirmed that they were pay on scan** and that these should not be factored as po's on terms. In addition I spoke with Adam, Stewart and Darren explaining that these were pay on scan in early October. Mike and Scott were on the phone for that call as well. The reason that there were rhym nor reason to the payments were because, as I have already explained to you, is that CVS pulls the pay on scan information, adds the total sales and pays on the invoices that equal the total for the pay on scan. **As for not taking po's for pay on scan, you took the po's from GNC that were pay on scan**…" (*See* Sullivan Aff., ¶ 31, Ex. D (Emphasis added)).

34. Beneficial and Integrated Biopharma, Inc. ("Integrated"), have referred to the purchase orders' purported "Terms and Conditions." The relevant purchase orders issued by CVS, however, did not contain the "Terms and Conditions" that Beneficial and Integrated have referenced (*See* Sullivan Aff., ¶ 32). Rather, these "Terms and Conditions" were merely available on www.cvssuppliers.com, a web site maintained by CVS that contains supplier/vendor information (*See* Sullivan Aff., ¶ 32).

35. CVS' web site, www.cvssuppliers.com is for informational purposes only (*See* Sullivan Aff., ¶ 33). CVS never referred Beneficial to www.cvssuppliers.com and informed

Beneficial that the contents of that web site would be incorporated into CVS' purchase orders (*See* Sullivan Aff., ¶ 33). Moreover, there is no indication that Beneficial ever accessed this web site and agreed to abide by the "Terms and Conditions" or requested that they be included in the agreement. (*See* Sullivan Aff., ¶ 33).

36. Rather, CVS directly negotiated the deal's terms and conditions with Beneficial and its agent, CMI (*See* Sullivan Aff., ¶ 34). For example, on or about May 18, 2006, Beneficial entered into a Return Option Agreement with CVS dealing with the return of WillpowerRX. Additionally, on or about June 21, 2006, Beneficial entered into an Indemnification Agreement with CVS (*See* Sullivan Aff., ¶ 34). In addition to containing an indemnification provision, this Indemnification Agreement also contained insurance procurement requirements (*See* Sullivan Aff., ¶ 34).

37. Moreover, Beneficial has abided by the terms and conditions outlined in the Carmichael Letter dealing with slotting requirements, the BDF marketing fund, and returned CVS' goods policy, despite the fact that these terms were not included in CVS' purchase orders (*See* Sullivan Aff., ¶ 35). Accordingly, neither CVS nor Beneficial utilized the "Terms and Conditions" on www.cvssuppliers.com.

38. Since this litigation has commenced, Beneficial has rejected all payments made by CVS (*See* Sullivan Aff., ¶ 36).

Respectfully submitted,

EDWARDS ANGELL PALMER &
DODGE LLP

Todd M. Reed, Esq. (#6602)
2800 Financial Plaza
Providence, Rhode Island 02903
(401) 274-9200
(401) 276-6611

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of June, 2006, a copy of the within document was mailed, via first class mail, to the following counsel of record:

David Wollin, Esquire
Adler Pollack & Sheehan, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903

CharCretia V. DiBartolo, Esquire
Hinshaw & Culbertson LLP
127 Dorrance Street, 4th Floor
Providence, RI 02903

Nicholas Fortuna, Esquire
Jesse A. Kaplan, Esquire
Allyn & Fortuna LLP
200 Madison Avenue, 5th Floor
New York, NY 10016

[signature]