UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

---

CVS PHARMACY, INC.

Plaintiff,

- against - Civil Action No.: 05-171-T

BENEFICIAL HOLDINGS, INC., BENEFICIAL HEALTH SYSTEMS, INC., BENEFICIAL NUTRACEUTICALS, INC., INTEGRATED BIOPHARMA, INC., and CONTEMPORARY MARKETING , INC.

Defendants.

---

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST INTEGRATED BIOPHARMA, INC.**

Plaintiff, CVS Pharmacy, Inc. ("CVS"), respectfully submits this Statement of Undisputed Material Facts in support of its motion for partial summary judgment against Integrated BioPharma, Inc. ("Integrated"):

1. Through a variety of subsidiary and affiliate entities, CVS operates retail drug stores and pharmacies (*See* Declaration of Thomas Sullivan, attached hereto as Exhibit A, ¶ 1).

2. Beneficial Holdings, Inc., Beneficial Health Systems, Inc., and Beneficial Nutraceuticals, Inc. (referred to collectively as "Beneficial") are distributors of a dietary supplement/weight loss product called WillpowerRX (*See* Exhibit A, ¶ 3).

3. Integrated affirmatively alleged in its Amended Counterclaim as follows: "On information and belief, CMI is a marketing and sales representative firm holding itself out as having the ability to place product of its customers with large retailers. On information and belief, Beneficial engaged in the services of CMI to assist it in the marketing and sale of

WillpowerRX to national chain retailers" (*See* Integrated's Amended Counterclaim, ¶ 8). Integrated further alleged as follows: "On information and belief, CMI arranged for Beneficial to enter into a relationship with CVS under which CVS agreed to purchase WillpowerRx from Beneficial and place WillpowerRx in its stores" (*See* Integrated's Amended Counterclaim, ¶ 9).

4. In the Spring of 2004, Ed Ellis, CMI's Vice President of marketing and sales, contacted Tom Sullivan, CVS' Category Manager for vitamin supplements, regarding whether CVS would be interested in carrying a product called WillpowerRX (*See* Exhibit A, ¶ 3). Ed Ellis indicated that CMI was the sales representative and product broker for WillpowerRX's distributor "Beneficial" (*See* Exhibit A, ¶ 3).

5. CVS subsequently entered into discussions with Beneficial through its sales representative and product broker, CMI, regarding CVS' possible purchase of WillpowerRX (*See* Exhibit A, ¶ 4). CVS and CMI discussed the terms and conditions that CVS would require if CVS was going to purchase WillpowerRX (*See* Exhibit A, ¶ 4). As a result of these discussions, Beneficial through its sales representative and product broker, CMI, agreed to Pay on Scan payment terms (*See* Exhibit A, ¶ 4).

6. Pay on Scan is similar to a consignment arrangement whereby a vendor is paid based on its product's sales performance (*See* Exhibit A, ¶ 5). Under a Pay on Scan arrangement, CVS would only be responsible for paying for units of WillpowerRX that CVS actually sold to its customers at its retail locations (*See* Exhibit A, ¶ 5).

7. In or around June 2004, Tom Sullivan received a letter on Beneficial letterhead signed by Beneficial's President, Harvey Carmichael, dated June 10, 2004, outlining the details of the agreement negotiated with CVS (the "Carmichael Letter"). (*See* Excerpts of deposition

transcripts of Harvey Carmichael, attached hereto as Exhibit B, p. 101; the Carmichael Letter, attached hereto as Exhibit B-13; Exhibit A, ¶ 6).

8. Of particular importance, the Carmichael Letter stated that "**Beneficial will extend terms of Pay on Scan for a period of one year**, after which the terms will switch to 2%30 net 31 days" (*See* Exhibit B-13 (Emphasis added)).

9. Subsequent to CVS' receipt of the Carmichael Letter, neither Beneficial nor CMI ever indicated to CVS that Beneficial was revoking its agreement to offer Pay on Scan or that Beneficial was having second thoughts about Pay on Scan (*See* Exhibit A, ¶ 8).

10. Between July 8, 2004, and December 16, 2004, CVS transmitted 96 purchase orders to CMI in Buffalo Grove, Illinois (*See* Exhibit A, ¶ 9). CVS issued purchase orders to Beneficial for the sole purpose of ordering goods from Beneficial (*See* Exhibit A, ¶ 9). These purchase orders were silent as to who would receive payment and clearly did not refer to Integrated or Beneficial's creditors as a class (*See* Exhibit A, ¶ 9).

11. Due to a clerical error, a number of CVS' purchase orders inadvertently and mistakenly included language indicating the eventual payment terms of 2%30 net 31, rather than the Pay on Scan payment terms that Beneficial and CVS had previously agreed to (*See* Exhibit A, ¶ 10). In early June, 2004, Tom Sullivan's office instructed CVS' accounting department to set Beneficial up as a Pay on Scan vendor (*See* Exhibit A, ¶ 10). While CVS' accounting department coded Beneficial as a Pay on Scan vendor, this information was not properly inputted into the system that automatically generates purchase orders (*See* Exhibit A, ¶ 10). Rather, when CVS initially set up Beneficial's vendor account, CVS inadvertently coded Beneficial as a 2%30 net 31 vendor in the system that automatically generates purchase orders despite Tom Sullivan's request that Beneficial be coded as a Pay on Scan vendor (*See* Exhibit A, ¶ 10).

12. According to Integrated, in August 2004, it entered into negotiations with Beneficial to provide financing. More specifically, Integrated first met with Beneficial representatives on August 6, 2004 (*See* Excerpts of deposition transcript of Eric Friedman, attached hereto as Exhibit C, pp. 10-11).

13. Integrated alleges that it took a security interest in a portion of Beneficial's accounts receivables (*See* Integrated's Amended Counterclaim, ¶ 13). More specifically, Integrated entered into a Security Agreement with Beneficial dated August 6, 2004 (*See* Stipulation, a copy of which is attached hereto as Exhibit D, ¶ 2).[1]

14. Though Integrated alleges that CVS induced Integrated to make such advances,[2] Integrated admits that CVS never made any representations to Integrated (*See* Exhibit C, pp. 110-111). Rather, Integrated affirmatively alleges that Beneficial represented to Integrated that Beneficial had obtained Net 31 Terms (*See* Integrated's Amended Counterclaim, ¶ 12).

15. Prior to August 2004, CVS was unaware of any relationship between Integrated and Beneficial (*See* Exhibit A, ¶ 11). When negotiating CVS' purchase of WillpowerRX, Beneficial and its representatives never discussed or identified Integrated (*See* Exhibit A, ¶ 11). Such a discussion would have been impossible since according to Integrated, Beneficial did not even begin conducting business with Integrated until August 2004 (*See* Exhibit C, pp. 110-111).

16. In fact, Harvey Carmichael admits that he never discussed Integrated with either CVS or CMI (*See* Exhibit B, p. 88).

17. Likewise, Integrated never filed or provided CVS with a financing statement (Form UCC1) perfecting a security interest in the CVS receivables (*See* Exhibit A, ¶ 14).

---

[1] This Security Agreement is governed by the laws of the State of New York.

[2] *See* Integrateds' Amended Counterclaim, ¶¶ 41-43.

18. Initially, Beneficial instructed CVS to make all payments to Beneficial in Utah (*See* Exhibit A, ¶ 12). On August 23, 2004, Beneficial sent a letter to CVS identifying "Integrated BioPharma, Inc., 225 Long Avenue, Hillside, NJ 07205" as Beneficial's new payment address (*See* Exhibit A, ¶ 12).

19. When negotiating CVS' purchase of WillpowerRX, Beneficial and its representatives never told CVS that Beneficial intended on or was contemplating assigning its receivables to a third-party and/or receiving financing from a third-party using its receivables as collateral (*See* Exhibit A, ¶ 15). CVS never knew that Beneficial would provide CVS' purchase orders to any third-party to obtain financing or for any other reason (*See* Exhibit A, ¶ 15). Beneficial and its representatives never even told CVS that Beneficial was going to or might obtain any financing (*See* Exhibit A, ¶ 15).

20. Harvey Carmichael admits that he never communicated to CVS or directed CMI to communicate to CVS that Beneficial allegedly did not have sufficient cash reserves or cash flow to supply CVS with WillpowerRX (*See* Exhibit B, pp. 88).[3]

21. In addition to the fact that Beneficial never disclosed to CVS that it might obtain financing based on CVS' purchase orders, Tom Sullivan and CVS never even contemplated that Beneficial would try to or would be able to obtain such financing (*See* Exhibit A, ¶ 16). As the parties had discussed and agreed upon Pay on Scan payment terms, it would have been unlikely that Beneficial would be able to obtain financing based on Beneficial's CVS receivables since payment by CVS was contingent on the ultimate sales performance of WillpowerRX (*See* Exhibit A, ¶ 16). Moreover, as CVS' category manager for vitamin supplements and the person responsible for entering into contracts for that category, Tom Sullivan had never previously been

[3] CVS does not admit that Beneficial did not have the sufficient cash flow to produce goods to fill CVS' purchase orders.

involved in a deal where to his knowledge, a vendor used CVS' purchase orders to obtain financing (*See* Exhibit A, ¶ 16).

Respectfully submitted,

EDWARDS ANGELL PALMER &
DODGE LLP

By:_____/s/ Todd M. Reed________

Todd Reed, Esq. (#6602)
2800 Financial Plaza
Providence, Rhode Island 02903
(401) 274-9200
(401) 276-6611

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of June, 2007, I did send a true copy of the within document by ECF and regular mail, to the following:

CharCretia V. DiBartolo, Esq.
Hinshaw & Culbertson LLP
155 South Main Street, Suite 304
Providence, RI 02903

Beneficial Holdings, Inc., Beneficial Health Systems, Inc.
and Beneficial Nutraceuticals, Inc.
c/o Jacquelynn D. Carmichael, Esq.
Eisenberg, Gilchrist & Morton
900 Parkside Tower
215 South State Street
Salt Lake City, Utah 84111

R. Daniel Prentiss, Esq.
R. Daniel Prentiss, P.C.
One Turks Head Place, Suite 380
Providence, RI 02903

/s/ Todd M. Reed