# EXHIBIT A

# DECLARATION OF THOMAS SULLIVAN

Thomas Sullivan, being duly sworn, states as follows:

1. I am employed as the Category Manager for vitamin supplements for CVS Pharmacy Inc. ("CVS"). Through a variety of subsidiary and affiliate entities, CVS operates retail drug stores and pharmacies.

2. I am fully familiar with the facts set forth herein.

3. In the spring of 2004, Contemporary Marketing, Inc'.s ("CMI") Vice President of marketing and sales, Ed Ellis, contacted me regarding whether CVS would be interested in carrying a product called WillpowerRX. Ed Ellis indicated that CMI was the sales representative and product broker for WillpowerRX's distributor "Beneficial."

4. I subsequently entered into discussions with Beneficial Holdings, Inc., Beneficial Health Systems, Inc., and/or Beneficial Nutraceuticals, Inc. (referred to collectively as "Beneficial"), through their sales representative and product broker, CMI, regarding CVS' possible purchase of WillpowerRX. We discussed the terms and conditions that CVS would require if CVS was going to purchase WillpowerRX. As a result of these discussions, Beneficial through its agent, CMI, agreed to Pay on Scan payment terms.

5. Pay on Scan is similar to a consignment arrangement whereby a vendor is paid based on its product's sales performance. Under a Pay on Scan arrangement, CVS would only be responsible for paying for units of WillpowerRX that CVS actually sold to its customers at its retail locations.

6. On or around June 2004, I received a letter on Beneficial letterhead signed by Beneficial's President, Harvey Carmichael, dated June 10, 2004, outlining the details of the agreement negotiated with CVS (the "Carmichael Letter").

7. Of particular importance, the Carmichael Letter stated that "**Beneficial will extend terms of Pay on Scan for a period of one year**, after which the terms will switch to 2%30 net 31 days (Emphasis added).

8. Subsequent to CVS' receipt of the Carmichael Letter, neither Beneficial nor CMI ever indicated to CVS that Beneficial was revoking its agreement to offer Pay on Scan or that Beneficial was having second thoughts about Pay on Scan.

9. Between July 8, 2004, and December 16, 2004, CVS transmitted 96 purchase orders to CMI in Buffalo Grove, Illinois. CVS issued purchase orders to Beneficial for the sole purpose of ordering goods from Beneficial. These purchase orders were silent as to who would receive payment and clearly did not refer to Integrated or Beneficial's creditors as a class.

10. Due to a clerical error, a number of CVS' purchase orders inadvertently and mistakenly included language indicating the eventual payment terms of 2%30 net 31, rather than the Pay on Scan payment terms that Beneficial and CVS had previously agreed to. In early June, 2004, my office instructed CVS' accounting department to set Beneficial up as a Pay on Scan vendor. While CVS' accounting department coded Beneficial as a Pay on Scan vendor, this information was not properly inputted into the system that automatically generates purchase orders. Rather, when CVS initially set up Beneficial's vendor account, CVS inadvertently coded Beneficial as a 2%30 net 31 vendor in the system that automatically generates purchase orders despite my request that Beneficial be coded as a Pay on Scan vendor.

11. Prior to August 2004, CVS was unaware of any relationship between Integrated BioPharma, Inc. ("Integrated") and Beneficial. When negotiating CVS' purchase of WillpowerRX, Beneficial and its representatives never discussed or identified Integrated.

12. Initially, Beneficial instructed CVS to make all payments to Beneficial in Utah. On August 23, 2004, Beneficial sent a letter to CVS identifying "Integrated BioPharma, Inc., 225 Long Avenue, Hillside, NJ 07205" as Beneficial's new payment address.

13. Through this litigation, I have learned that Integrated BioPharma, Inc. ("Integrated"), alleges that it provided Beneficial with financing and took a security interest in a portion of Beneficial's accounts receivables.

14. Integrated never filed or provided CVS with a financing statement (Form UCC1).

15. When negotiating CVS' purchase of WillpowerRX, Beneficial and its representatives never told CVS that Beneficial intended on or was contemplating assigning its receivables to a third-party and/or receiving financing from a third-party using its receivables as collateral. CVS never knew that Beneficial would provide CVS' purchase orders to any third-party, to obtain financing or for any other reason. Beneficial and its representatives never even told CVS that Beneficial was going to or might obtain any financing.

16. In addition to the fact that Beneficial never disclosed to CVS that it might obtain financing based on CVS' purchase orders or otherwise, I never even contemplated that Beneficial would try to or would be able to obtain such financing. As the parties had discussed and agreed upon Pay on Scan payment terms, it would have been unlikely that Beneficial would be able to obtain financing based on Beneficial's CVS receivables since payment by CVS was contingent on the ultimate sales performance of WillpowerRX. Moreover, as CVS' category manager for vitamin supplements and the person responsible for entering into contracts for that category, I had never previously been involved in a deal where to my knowledge, a vendor used CVS' purchase orders to obtain financing.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 21st DAY OF JUNE 2007

Thomas Sullivan

Ellen E. Putnam
Dated 6/21/07

**Ellen E. Putnam**
**Notary Public**
**State of Rhode Island**
**My Commission expires: 07/28/2010**