UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CVS PHARMACY, INC.

Plaintiff,

- against -

Civil Action No.: 05-171-T

BENEFICIAL HOLDINGS, INC., BENEFICIAL HEALTH SYSTEMS, INC., BENEFICIAL NUTRACEUTICALS, INC., INTEGRATED BIOPHARMA, INC., and CONTEMPORARY MARKETING , INC.

Defendants.

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BENEFICIAL**

Plaintiff, CVS Pharmacy, Inc. ("CVS"), respectfully submits this Statement of Undisputed Material Facts in support of its motion for partial summary judgment against Beneficial Holdings, Inc., Beneficial Health Systems, Inc., and Beneficial Nutraceuticals, Inc. (referred to collectively as "Beneficial"):

1. Through a variety of subsidiary and affiliate entities, CVS operates retail drug stores and pharmacies (*See* Declaration of Thomas Sullivan, attached hereto as Exhibit A, ¶ 1).

2. Beneficial is the distributor of a dietary supplement/weight loss product called WillpowerRX (*See* Exhibit A, ¶ 3).

3. Beneficial affirmatively alleges in its Counterclaim as follows: "Contemporary Marketing, Inc. (hereinafter "CMI") through its agent and/or employee Ed Ellis, negotiated the placement of Beneficial's product, WillpowerRX™, for retail sale with CVS Pharmacy, Inc." (*See* Beneficial's Counterclaim, ¶ 5).

4. In the Spring of 2004, Ed Ellis, CMI's Vice President of marketing and sales, contacted Tom Sullivan, CVS' Category Manager for vitamin supplements, regarding whether CVS would be interested in carrying a product called WillpowerRX (*See* Exhibit A, ¶ 3). Ed Ellis indicated that CMI was the sales representative and product broker for WillpowerRX's distributor "Beneficial" (*See* Exhibit A, ¶ 3).

5. CVS subsequently entered into discussions with Beneficial through its sales representative and product broker, CMI, regarding CVS' possible purchase of WillpowerRX (*See* Exhibit A, ¶ 4). While many of these discussions entailed telephone conversations between Tom Sullivan and Ed Ellis, Tom Sullivan also met with Ed Ellis at CVS' Woonsocket, Rhode Island headquarters on several occasions during the spring of 2004 (*See* Exhibit A, ¶ 4).

6. During the telephone conversations and meetings, CVS and Beneficial's sales representative and product broker, CMI, discussed the terms and conditions that CVS would require if CVS was going to purchase WillpowerRX (*See* Exhibit A, ¶ 6).

7. The parties also discussed the quantity of WillpowerRX that Beneficial would need to guaranty in order to adequately stock CVS' retail locations (*See* Exhibit A, ¶ 6). The parties discussed that Beneficial would have to deliver WillpowerRX on an ongoing basis as required by CVS to adequately stock CVS retail locations (*See* Exhibit A, ¶ 6). Beneficial's sales representative and product broker, CMI, agreed that this could be done (*See* Exhibit A, ¶ 6).

8. Of particular importance was the issue of payment terms. Tom Sullivan told CMI that CVS viewed WillpowerRX as a risky endeavor because Beneficial was a new vendor and because WillpowerRX was a new product with no proven sales record or recognizable brand name (*See* Exhibit A, ¶ 7).

9. Therefore, Tom Sullivan told CMI on multiple occasions, including the meetings at CVS' headquarters, that CVS would only consider purchasing WillpowerRX if Beneficial was willing to offer CVS Pay on Scan payment terms (*See* Exhibit A, ¶ 8). Tom Sullivan made it absolutely clear that Pay on Scan was not negotiable (*See* Exhibit A, ¶ 8). Ed Ellis, acting as Beneficial's sales representative and product broker, expressed his understanding and agreed that the payment terms would have to be Pay on Scan (*See* Exhibit A, ¶ 8).

10. Pay on Scan is similar to a consignment arrangement whereby a vendor is paid based on its product's sales performance (*See* Exhibit A, ¶ 9). Under a Pay on Scan arrangement, CVS would only be responsible for paying for units of WillpowerRX that CVS actually sold to its customers at its retail locations (*See* Exhibit A, ¶ 9).

11. In or around June 2004, Tom Sullivan received a letter on Beneficial letterhead signed by Beneficial's President, Harvey Carmichael, dated June 10, 2004, outlining the details of the agreement negotiated with CVS (the "Carmichael Letter"). (*See* Excerpts of deposition transcripts of Harvey Carmichael attached hereto as Exhibit B, p. 101; the Carmichael Letter, a copy of which is attached hereto as Exhibit B-13; Exhibit A, ¶ 10).

12. Harvey Carmichael does not dispute that he signed the Carmichael Letter (*See* Exhibit B, p. 101; Beneficial's Counterclaim, ¶¶ 10-13).

13. The Carmichael Letter began by thanking Tom Sullivan for meeting with Beneficial and providing Beneficial on guidance on how Beneficial can market WillpowerRX to CVS' customers. More specifically, the Carmichael Letter stated as follows:

> "Thank you for giving us the opportunity to meet with you to discuss the Willpower RX brand by Beneficial Health. We are very excited about partnering with your company as we bring this brand to retail. We very much appreciated you guidance on what has been successful and how we can better market the brand to the CVS customer. I have outlined the details of our proposal below for your review:" (*See* Exhibit B-13)

14. The Carmichael Letter then detailed the price, payment terms, displays, returns, and slotting for WillpowerRx (*See* Exhibit B-13). The Carmichael Letter also stated that Beneficial would "offer CVS an ongoing BDF marketing fund of 10% to be taken off invoice." The Carmichael Letter further stated that all returns would be handled as outlined in the CVS return goods agreement. The Carmichael Letter also authorized CVS to deduct a one time charge of $5,000 to cover new item slotting. Beneficial also agreed to undertake certain marketing and advertising efforts (*See* Exhibit B-13).

15. Of particular importance, the Carmichael Letter stated that "**Beneficial will extend terms of Pay on Scan for a period of one year**, after which the terms will switch to 2%30 net 31 days (*See* Exhibit B-13 (Emphasis added)). Accordingly, pursuant to the terms of the Carmichael Letter, CVS would only have to pay for WillpowerRX that CVS sold during the first year of the relationship (*See* Exhibit B-13). After one year, the payment terms would become "2%30 net 31 days" (*See* Exhibit B-13).[1]

16. Subsequent to CVS' receipt of the Carmichael Letter, neither Beneficial nor CMI ever indicated to CVS that Beneficial was revoking its agreement to offer Pay on Scan or that Beneficial was having second thoughts about Pay on Scan (*See* Exhibit A, ¶ 11). Rather, CMI and Beneficial continued to aggressively push for CVS to issue purchase orders (*See* Exhibit A, ¶ 11).

17. In fact, Harvey Carmichael admits that prior to Beneficial's receipt of CVS purchase orders, as far as he was concerned, the payment terms for CVS could have been Pay on Scan since nothing was ever said to the contrary (*See* Exhibit B, p. 226).

---

[1] "2%30 net 31" is a payment term that generally means that the purchaser of goods will receive a 2% discount if it makes payment to the seller within thirty days of the its receipt of conforming goods. The purchaser of goods will not receive a 2% discount if payment is made after 30 days of the buyer's receipt of conforming goods (*See* Exhibit A, ¶ 10).

18. On June 21, 2004, Beneficial executed an Indemnification Agreement in favor of CVS and CVS' Returned Goods Agreement (*See* Exhibit A, ¶ 12).

19. On July 2, 2004, Ed Ellis, Beneficial's sales representative and product broker, sent Tom Sullivan an email regarding Beneficial's marketing and promotional campaign. Ed Ellis' email reiterated that Beneficial had agreed to Pay on Scan. The email stated in pertinent part, "**They are pay on scan**" (*See* Exhibit A, ¶ 13; Exhibit A-1).

20. In early July 2004, Tom Sullivan informed Ed Ellis that CVS was going to accept the terms negotiated and outlined in the Carmichael Letter, and that purchase orders would be forthcoming (*See* Exhibit A, ¶ 14).

21. Between July 8, 2004, and December 16, 2004, CVS transmitted 96 purchase orders to CMI in Buffalo Grove, Illinois (*See* Exhibit A, ¶ 15; Stipulation, a copy of which is attached hereto as Exhibit C, ¶ 1; Exhibit C-1).[2]

22. Since CVS' computer system that generated purchase orders did not have the capability of actually writing "Pay on Scan" on the purchase orders, CVS indicated Pay on Scan payment terms by leaving a purchase order's payment terms blank (*See* Exhibit A, ¶ 16).

23. Due to a clerical error, a number of CVS' purchase orders inadvertently and mistakenly included language indicating the eventual payment terms of 2%30 net 31, rather than the Pay on Scan payment terms that Beneficial and CVS had previously agreed to (*See* Exhibit A, ¶ 17).

24. Despite the language found on the initial CVS purchase orders, the parties never agreed to payment terms other than Pay on Scan (*See* Exhibit A, ¶ 18). Moreover, there was no reason for CVS to change the Pay on Scan payment term that the parties had previously agreed

[2] CVS entered into a stipulation with defendant Integrated BioPharma, Inc., itemizing all CVS purchase orders that CVS issued to CMI/Beneficial, the date each purchase order was received, and the date CVS received goods under each purchase order.

to since neither CMI nor Beneficial had ever requested such a change or indicated that Beneficial would not agree to Pay on Scan (*See* Exhibit A, ¶ 18).

25. CVS never provided CMI with authority to act as CVS' representative/agent in any manner, including authorization to receive notification on CVS' behalf (*See* Exhibit A, ¶ 5).

26. Beginning in August 2004, Lask would frequently contact CVS on Beneficial's behalf regarding Beneficial's account, and would request information from CVS regarding payment issues (*See* Exhibit B-52). In particular, on Friday August 27, 2004, Lask sent CVS an email inquiring into when Beneficial would receive CVS' first payment (*See* Exhibit B-52 (CVS 0223).

27. On Friday August 27, 2004, CVS informed Beneficial in writing that Beneficial was a Pay on Scan vendor despite the fact that CVS' purchase orders contained language that Beneficial may have perceived as "2% 30 Net 31" payment terms. More specifically, on August 27, 2004, Jennifer Bernard from CVS' Warehouse Accounts Payable Department, sent an email to Stewart Lask stating as follows: "I see that you are a 'Pay on Scan' vendor, which means the sales work like a consignment agreement. The invoices are paid according to sales. I am not able to anticipate when the invoices will be paid for that reason. Thank you." (*See* Exhibit B-52 (CVS 0222).

28. Lask acknowledged receipt of this email, and testified that it really caught his attention (*See* Excerpts of deposition transcript of Stewart Lask, attached hereto as Exhibit D, p. 127). Upon receiving CVS' August 27, 2004 email, Lask was very concerned and determined that CVS' notification was something that he needed to deal with immediately (*See* Exhibit D, p. 127).

29. Lask contacted Beneficial's President, Harvey Carmichael, to discuss that CVS had notified Beneficial that that the agreement and the purchase orders were really Pay on Scan (*See* Exhibit D, p. 127). Lask also notified Ed Ellis at CMI (*See* Exhibit D, p. 127).

30. Harvey Carmichael does not dispute that based on CVS' email to Stewart Lask, Beneficial learned that CVS would only agree to Pay on Scan payment terms (*See* Exhibit C, pp. 169-170).[3]

31. On August 27, 2004, Tom Sullivan was forwarded a copy of the emails between Stewart Lask and Jennifer Bernard (*See* Exhibit A, ¶ 19). On September 3, 2007, Tom Sullivan sent an email to his assistant, Tobias Lombardi, requesting that Lombardi clear this up (*See* Declaration of Tobias Lombardi, attached hereto as Exhibit E, ¶ 5; Exhibit A, ¶ 19; Exhibit B-52(CVS 0221)).

32. In early September 2004, Ed Ellis had a telephone conversation with Lombardi, regarding the purchase orders' obvious clerical error as to payment terms (*See* Exhibit E, ¶ 6). Once again, CVS notified CMI, Beneficial's sales representative and product broker, CMI, that CVS' had and would only agree to Pay on Scan payment terms (*See* Exhibit E, ¶ 6). Ed Ellis confirmed that Beneficial was aware that CVS' purchase orders incorrectly contained "2%30 net 31" payment terms and that the correct payment term was Pay on Scan (*See* Exhibit E, ¶ 6).

33. On October 20, 2004, CVS issued a check, making its first payment for WillpowerRX (*See* Exhibit A, ¶ 22).

34. Beneficial affirmatively alleges in its Counterclaim that: "Sometime later, **while still awaiting receipt of the first payment from CVS**, agents for Beneficial's manufacturer, as well as for Beneficial's private investor, **contacted the accounts payable department of CVS**

[3] Harvey Carmichael specifically identified the August 27, 2004 email between Stewart Lask and Jennifer Bernard (Exhibit 52).

directly and were told that it was the understanding of that department that CVS's payment obligation to Beneficial were 'Pay on Scan'" (*See* Beneficial's Counterclaim, ¶ 39(emphasis added)).

35. Beneficial also affirmatively alleges in its Counterclaim that this information was reported to Beneficial. More specifically, Beneficial alleged as follows: "**When this information was reported to Beneficial**, Beneficial assumed that CVS's accounting department was not aware of the terms contained in the CVS purchase orders and that the misunderstanding could be remedied" (*See* Beneficial's Counterclaim, ¶ 40).

36. Beneficial further affirmatively alleges in its Counterclaim that CMI confirmed that the payment terms were in fact Pay on Scan. More specifically, Beneficial alleged as follows: "To the contrary, when Beneficial contacted CMI for assistance in obtaining proper payment from CVS, CMI indicated that the payment terms were not going to be Net 31 after all and would, in fact, be subject to a 'pay on scan' arrangement" (*See* Beneficial's Counterclaim, ¶ 41).

37. Accordingly, based on CVS' August 27, 2004 email, and CVS' conversation with CMI, Beneficial was put on notice that CVS' purchase orders contained clerical errors, and that CVS intended them to contain Pay on Scan payment terms (*See* Beneficial's Counterclaim, ¶ 41; Exhibit B-52; Exhibit E, ¶ 6).

38. Both Beneficial and Integrated allege in their counterclaims that CVS purchase orders were offers, and that Beneficial accepted these offers by "filling" CVS' purchase orders. More specifically, Beneficial alleged as follows: "Beneficial and CVS shared a contractual relationship. The purchase orders submitted by CVS to Beneficial were 'offers' and Beneficial's 'filling' of the purchase orders were 'acceptances' of CVS's offers" (*See* Beneficial's

Counterclaim, ¶ 56). Likewise Integrated alleged as follows: "The CVS Net 31 purchase orders constituted offers to purchase goods according to Net 31 terms. Beneficial accepted the offer by causing goods to be shipped to CVS under the purchase orders. On Beneficial's acceptance, the purchase orders became contracts binding CVS to the payment terms" (*See* Integrated's Amended Counterclaim, ¶ 22).

39. Beneficial, however, chose to "fill" a large number of the CVS purchase orders containing the incorrect payment terms well after August 27, 2004, when CVS confirmed that Beneficial was a Pay on Scan vendor. More specifically, as of August 27, 2004, CVS had issued 48 purchase orders (*See* Exhibit C, ¶ 1; Exhibit C-1). As of August 27, 2004, CVS had only received goods filling 23 of CVS' 48 purchase orders (*See* Exhibit C, ¶ 1; Exhibit C-1). Between August 27, 2004, and September 2, 2004, when CVS remedied the error in its computer system that generates purchase orders, CVS issued an additional 7 purchase orders containing incorrect payment terms (*See* Exhibit C, ¶ 1; Exhibit C-1). As of September 3, 2004, Beneficial had only filled 25 of the 55 purchase orders that CVS issued, two of which were filled on August 30 and 31, 2004, after Beneficial was put on notice that CVS payment terms were Pay on Scan (*See* Exhibit C, ¶ 1; Exhibit C-1). Accordingly, there were 30 purchase orders that Beneficial had yet to fill (*See* Exhibit C, ¶ 1; Exhibit C-1).

40. After being notified that CVS intended these purchase orders to contain Pay on Scan payment terms, Beneficial waited anywhere from 12 to 58 days to fill these 30 purchase orders (*See* Exhibit C, ¶ 1; Exhibit C-1). These 30 purchase orders account for $651,696 of the monies that Beneficial claims are now owed (*See* Exhibit C, ¶ 1; Exhibit C-1). Additionally, the two purchase orders filled on August 30 and 31, 2007, account for $41,184 of the monies that Beneficial claims are now owed under these purchase orders (*See* Exhibit C, ¶ 1; Exhibit C-1).

41. Beneficial chose to fill these purchase orders subject to CVS' August 27, 2004 email stating that Beneficial was a Pay on Scan vendor, subject to CVS' notification to CMI that Beneficial was a Pay on Scan vendor, and knowing that CVS intended to pay Beneficial on a Pay on Scan basis (*See* ¶¶ 27-40). At the very least, Beneficial knew that any purchase orders that it filled subsequent to August 27, 2004, would be paid on a Pay on Scan basis (*See* ¶¶ 27-40).

42. After speaking with CMI, CVS remedied the error in its computer system that generated purchase orders so that all subsequent purchase orders would reflect the correct Pay on Scan payment terms (*See* Exhibit A, ¶ 20).

43. From September 15, 2004, to December 16, 2004, CVS issued an additional 41 purchase orders to Beneficial, all of which contained payment term language indicating Pay on Scan payment terms (*See* Exhibit C, ¶ 1; Exhibit C-1). That is, CVS identified Pay on Scan payment terms by leaving the payment terms blank (*See* Exhibit A, ¶ 21; Exhibit C-1).

44. Beneficial filled these 41 CVS purchase orders containing Pay on Scan payment terms subject to CVS' August 27, 2004 email stating that Beneficial was a Pay on Scan vendor, subject to CVS' notification to CMI that Beneficial was a Pay on Scan vendor, and knowing that CVS intended to pay Beneficial on a Pay on Scan basis (*See* ¶¶ 27-40).

Respectfully submitted,

EDWARDS ANGELL PALMER &
DODGE LLP

By: /s/ Todd M. Reed
Todd Reed, Esq. (#6602)
2800 Financial Plaza
Providence, Rhode Island 02903
(401) 274-9200
(401) 276-6611

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of June, 2007, I did send a true copy of the within document by ECF and regular mail, to the following:

CharCretia V. DiBartolo, Esq.
Hinshaw & Culbertson LLP
155 South Main Street, Suite 304
Providence, RI 02903

Beneficial Holdings, Inc., Beneficial Health Systems, Inc.
and Beneficial Nutraceuticals, Inc.
c/o Jacquelynn D. Carmichael, Esq.
Eisenberg, Gilchrist & Morton
900 Parkside Tower
215 South State Street
Salt Lake City, Utah 84111

R. Daniel Prentiss, Esq.
R. Daniel Prentiss, P.C.
Turks Head Place, Suite 380
Providence, RI 02903

/s/ Todd M. Reed