# EXHIBIT A

**DECLARATION OF THOMAS SULLIVAN**

Thomas Sullivan, being duly sworn, states as follows:

1. I am employed as the Category Manager for vitamin supplements for CVS Pharmacy Inc. ("CVS"). Through a variety of subsidiary and affiliate entities, CVS operates retail drug stores and pharmacies.

2. I am fully familiar with the facts set forth herein.

3. In the spring of 2004, Contemporary Marketing, Inc'.s ("CMI") Vice President of marketing and sales, Ed Ellis, contacted me regarding whether CVS would be interested in carrying a product called WillpowerRX. Ed Ellis indicated that CMI was the sales representative and product broker for WillpowerRX's distributor "Beneficial."

4. CVS subsequently entered into discussions with Beneficial Holdings, Inc., Beneficial Health Systems, Inc., and/or Beneficial Nutraceuticals, Inc. (referred to collectively as "Beneficial"), through their sales representative and product broker, CMI, regarding CVS' possible purchase of WillpowerRX. While many of these discussions entailed telephone conversations with Ed Ellis, I also met with Ed Ellis at CVS' Woonsocket, Rhode Island headquarters on several occasions during the spring of 2004.

5. CVS never provided CMI with authority to act as CVS' representative/agent in any manner, including authorization to receive notification on CVS' behalf.

6. During the telephone conversations and meetings, we discussed the terms and conditions that CVS would require if CVS was going to purchase WillpowerRX. This included the quantity of WillpowerRX that Beneficial would need to guaranty in order to adequately stock CVS' retail locations. We discussed that Beneficial would have to deliver WillpowerRX on an

ongoing basis as required by CVS in order to adequately stock CVS retail locations. CMI, Beneficial's sales representative and product broker, agreed that this could be done.

7. Of particular importance was the issue of payment terms. I told CMI that CVS viewed WillpowerRX as a risky endeavor because Beneficial was a new vendor and because WillpowerRX was a new product with no proven sales record or recognizable brand name.

8. Therefore, I told CMI on multiple occasions, that CVS would only consider purchasing WillpowerRX if Beneficial was willing to offer CVS Pay on Scan payment terms. I made it quite clear that Pay on Scan was not negotiable. Ed Ellis, acting as Beneficial's sales representative and product broker, expressed his understanding and agreed that the payment terms would have to be Pay on Scan.

9. Pay on Scan is similar to a consignment arrangement whereby a vendor is paid based on its product's sales performance. Under a Pay on Scan arrangement, CVS would only be responsible for paying for units of WillpowerRX that CVS actually sold to its customers at its retail locations.

10. In or around June 2004, I received a letter on Beneficial letterhead signed by Beneficial's President, Harvey Carmichael, dated June 10, 2004, outlining the details of the agreement negotiated with CVS (the "Carmichael Letter"). Of particular importance, the Carmichael Letter stated that **"Beneficial will extend terms of Pay on Scan for a period of one year,** after which the terms will switch to 2%30 net 31 days" (emphasis added).[1]

11. Subsequent to CVS' receipt of the Carmichael Letter, neither Beneficial nor CMI ever indicated to CVS that Beneficial was revoking its agreement regarding Pay on Scan or that

[1] "2%30 net 31" is a payment term that generally means that the purchaser of goods will receive a 2% discount if it makes payment to the seller within thirty days of the its receipt of conforming goods. The purchaser of goods will not receive a 2% discount if payment is made after 30 days of the buyer's receipt of conforming goods.

Beneficial was having second thoughts about Pay on Scan. Rather, Beneficial continued to aggressively push for CVS to issue purchase orders.

12. On June 21, 2004, Beneficial executed an Indemnification Agreement in favor of CVS and CVS' Returned Goods Agreement.

13. On July 2, 2004, Ed Ellis, Beneficial's sales representative and product broker, sent me an email regarding Beneficial's marketing and promotional campaign. Ed Ellis' email reiterated that Beneficial had agreed to Pay on Scan. The email stated in pertinent part, "**They are pay on scan**" (emphasis added). A true and accurate copy of that email is attached hereto as Exhibit A-1.

14. In early July 2004, I informed Ed Ellis that CVS was going to accept the terms negotiated and outlined in the Carmichael Letter, and that purchase orders would be forthcoming.

15. Between July 8, 2004, and December 16, 2004, CVS transmitted 96 purchase orders to CMI in Buffalo Grove, Illinois.

16. Since CVS' computer system that generated purchase orders did not have the capability of actually writing "Pay on Scan" on the purchase orders, CVS indicated Pay on Scan payment terms by leaving a purchase order's payment terms blank.

17. Due to a clerical error, a number of CVS' purchase orders inadvertently and mistakenly included language indicating the eventual payment terms of 2%30 net 31, rather than the Pay on Scan payment terms that Beneficial and CVS had agreed to.

18. Despite the language found on the initial CVS purchase orders, the parties never agreed to payment terms other than Pay on Scan. Moreover, there was no reason for CVS to change the Pay on Scan payment term that the parties had previously agreed to since neither CMI

nor Beneficial had ever requested such a change or indicated that Beneficial would not agree to Pay on Scan.

19. Beginning in late August 2004, several of Beneficial's representatives contacted CVS regarding CVS' purchase order's payment terms. CVS confirmed that Beneficial had always been a Pay on Scan vendor. On August 27, 2004, I was forwarded a copy of emails between Stewart Lask and Jennifer Bernard. On September 3, 2007, I sent an email to my assistant category manager, Tobias Lombardi, requesting that Lombardi clear this up.

20. After speaking with CMI, CVS remedied the error in its computer system that generated purchase orders so that all subsequent purchase orders would reflect the correct Pay on Scan payment terms.

21. From September 15, 2004, to December 16, 2004, CVS issued an additional 41 purchase orders to Beneficial, all of which contained language indicating Pay on Scan payment terms. That is CVS identified Pay on Scan payment terms by leaving the payment terms blank.

22. On October 20, 2004, CVS made its first payment for WillpowerRX.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 21st DAY OF JUNE 2007

Thomas Sullivan

Ellen E. Putnam
Dated 6/21/07

Ellen E. Putnam
Notary Public
State of Rhode Island
My Commission expires: 07/28/2010