# EXHIBIT B

Hot Rocks are.

MS. CARMICHAEL: Can we take a short break?

MR. WEISBERGER: Yes.

(Brief recess at 4:20 p.m.)

Q. (BY MR. WEISBERGER) Exhibit 13. Take a look at that and tell me when you have had a chance to review it.

A. Okay.

Q. They are both stamped separately. One is B 0457 and the other is CMI 00033, but they are identical.

Do you recognize the letter?

A. I do.

Q. It is a letter to Tom Sullivan at CVS?

A. Yes.

Q. From you?

A. Yes.

Q. Who authored the letter?

A. Someone at CMI.

Q. You didn't actually write it?

A. No.

Q. Who actually typed it up?

A. I don't know. It was e-mailed to me from CMI or e-mailed to Darren, and Darren gave it to me.

Q. That is your signature that appears at the bottom?

A. Yes.

Q. Did you read it before you signed it?

A. Absolutely not.
Q. You never heard that?
A. No.
Q. They have never said that to you?
A. No.
Q. No one else has ever said that to you?
A. I have never heard that until today.
Q. At some point, didn't CVS inform Beneficial that the purchase orders were pay on scan?
A. I would imagine, or we wouldn't be sitting here today.
Q. Certainly. We looked at Exhibit 50, which indicates that -- I mean, that was from Adam Satin to Ed Ellis?
A. That wasn't the first time. I believe that there has been contact.
Q. Even before that?
A. There was some time that there had been contact; yes.
Q. Saying that the purchase orders were pay on scan?
A. I believe it was learned around about September, the week of September 15th through the 20th, because there is e-mail that show there is correspondence going back and forth between Stewart Lask, and for reference, Exhibit 52, that there is -- Jennifer Bernard and Stewart Lask are having

e-mail back and forth around August 27th about trying to be paid by CVS.

Q. Did Beneficial, to the best of your knowledge, receive each of the purchase orders that are contained in Exhibit 20?

A. Best of my knowledge, yes.

Q. What was the process or the procedure for receiving these purchase orders?

A. They were sent from CVS via EDI to CMI and then printed at the corporate office of CMI and then faxed by one or many of their employees to myself at my office in Salt Lake City. And then I would sign and accept the terms within these purchase orders and then send them back.

Q. You anticipated my next question.

A. Okay.

Q. What was the procedure if Beneficial was unable to fill a purchase order?

A. We wouldn't sign and send it back.

Q. Anything else?

A. If we weren't able?

Q. Yes.

A. I probably wouldn't accept it. If I had accepted it, I would have had some type of funding back-up that was triggered to be able to do it.

Q. Now, can you turn to Exhibit 21? That is Bates

A. It could be 60-day terms with a package of you buy so many cases and you get so many cases free. You run their banners or ads on your website and you, you know, tag them in so many different spots for better terms and pay on scan, because I signed a letter to that effect, 30-day 30-net terms.

It was -- nothing was ever set in any solid thing prior to me receiving these. When this came across, I took it to believe we received 30-day 30-net terms.

Q. As far as you were concerned, prior to receipt of the purchase orders in July 2004, the payment terms for CVS could have been any number of different terms?

A. Right.

Q. There was nothing said; right?

A. Right.

Q. One of those terms could have been pay on scan?

A. Could have.

Q. You testified yesterday that it was not negotiable as a pay-on-scan term if CVS was the first anchor retailer; right?

A. Right.

Q. But as of the time -- before the first CVS purchase order, you didn't have any retailers; right?

A. Correct. Therefore, our anchor did have 30-day 30-net terms which, in my eyes, was true.